This appeal is by Mrs. R. A. Laning, plaintiff in the court below, from an order of the district court denying her a temporary writ of injunction to restrain the sale of an automobile which had been levied on under a writ of execution issued under a judgment theretofore recovered against Mrs. Laning by the Langford Investment Company, who, together with the constable who had made the levy and the attorney of record for the Langford Investment Company, were all made parties defendant.
As a basis for the relief prayed for by the plaintiff, it was alleged that the automobile was exempt from forced sale under the Constitution or statutes, since she was the head of a family.
There is no provision in our Constitution which would render the automobile exempt, and if such exemption obtains it must be by virtue of the provision of article 3832, Revised Civil Statutes 1925, which reads in part as follows:
"The following property shall be reserved to every family, exempt from attachment or execution and every other species of forced sale for the payment of debts, except as hereinafter provided:
"1. The homestead of the family. * * *
"10. One carriage or buggy. * * *"
It is settled by the decisions of this state that an automobile is a carriage within the meaning of subdivision 10 of that article of the statutes.
Hence the only disputed issue involved in this case is whether or not Mrs. Laning was the head of a family.
Upon the hearing of the application for the temporary writ, evidence was introduced which showed that prior to the institution of this suit, the Langford Investment Company had recovered a judgment against Mrs. R. A. Laning for house rent in the sum of $1,200, which was unpaid, and that execution issued on that judgment had been levied on the automobile in controversy, which was a La Salle coupé, and that the same had been advertised for sale under that levy; the suit being brought to restrain such sale.
Aside from the proof of those facts, the only evidence offered upon the hearing consisted of the testimony of plaintiff herself, which may be briefly summarized as follows:
Plaintiff and her husband, R. A. Laning, now deceased, moved to Wichita Falls in the year of 1918, and she has resided there ever since. During their married life they maintained a home in which they lived continuously up to the time of the husband's death. Since the death of the husband, *Page 1080 
plaintiff has never boarded or lived in an apartment but has maintained a home with furniture, which she has occupied as her place of abode. At the time of the husband's death, the couple owned a seven-passenger sedan car, which was used as a family car. After his death, she kept that car and used it as a family car and also in the oil business, in which she was engaged, for a period of two years. She then traded the car for the car in controversy, paying a difference in the trade of $2,500; the purchase price of the new car being $3,000, and the seller taking in the old car at a valuation of $500. Plaintiff and her husband had no children and she is still a widow of R. A. Laning without children. After the burial of plaintiff's husband in September, 1924, her girl cousin came to live with her, but no one else except that girl has lived with her. She then testified as follows:
"This young lady who is my cousin, came to live with me when I brought her back with me when I buried Mr. Laning. That was in September, 1924. She lived with me then, two years. She lived with me until about August or September 1926. I did not say that she did not live with me then until 1930. She was gone for two winters. She came back during the summer of each year. She would come back in the summer and stay with me. Then she would go back to her father and mother and stay during the winter. The last time she came back to stay with me was July 1930. She is living with me now and has been since July, 1930. She is eighteen years old, since last September. At my house she looks after my house and keeps house for me. Her father and mother are living. Her father and mother raised her until she came to live with me in August, 1924. Her father and mother live in Indiana. She is a cousin of mine. She has other relatives. She has two brothers, besides her father and mother. One is sixteen years and the other twenty-nine years of age. The older boy lives in Indiana. She has no uncles that I know of. She has an Aunt. She lives in a soldiers home in Indiana. I do not pay this young lady any wages. She gets her board and dresses and I send her to school. In consideration, she looks after my home. As to when her father became incapacitated so that he could not support this young lady, I could not say. He has never been where he could really support a family. Her mother helped support the girl in 1924. They raised two other children. The older brother is twenty-nine years old, is married and works and supports a family. Her father is not a shiftless fellow, but is not a strong man. He does not work. He lives on a pension. The girls mother is not doing anything. There is no one to support this girl but myself. As to how she came to live with me: well, I have always helped her, even when she was a baby. I have always helped the family. I have always sent clothes and money to help her out. As to who supported her during the two years when she was gone from me, I sent her money. I do not remember how much. I do not remember approximately. I just sent her some money now and then to help her out. She was living in Terre Haute, Indiana with her father and mother. They have a home there. As to why I did not have her come to live with me before Mr. Laning died, was because I was in the office and helping him and just did not do it. I did not bring her down to live with me after Mr. Laning's death to keep me company. That was not the reason. I brought her after his death because I wanted to help her out. I did help her out and wanted to help her out before Mr. Laning died. I am certainly insolvent. I had a deal on the other day and lost the deal because the constable took my car. I did not have the money to get another car any where. It is not a fact that I have a number of diamonds."
The date of the trial was December 31, 1930.
The judgment formerly recovered by the Langford Investment Company against the plaintiff, and under which the car in controversy was levied on, was for rents due the investment company on the house in which plaintiff had resided as a home after her husband's death. No other witness testified in the case except P. P. Langford, the manager of the Langford Investment Company, and his testimony related solely to the judgment which the investment company had recovered against the plaintiff. And no testimony was offered from any source to contradict that of the plaintiff.
The trial judge filed findings of fact and conclusions of the law which appear in the record. The findings of fact so filed embody in substance a recital of the facts so testified to by the plaintiff, except that the court found that "the parents of the girl have a home where they live, and are able to support the said girl." And one of the conclusions of law reached by the judge reads as follows:
"I conclude that under the facts proven and found, plaintiff was not morally bound to support the said cousin so as to entitle plaintiff to the exemption of the said La Salle coupé."
The finding that the parents of the girl are able to support her was a conclusion drawn by the trial judge from the fact, as shown by plaintiff's testimony, that her parents had reared and supported her up to the time she came to plaintiff in September. 1924, and while she had spent two winters with her parents after she had first lived with the plaintiff for two years. *Page 1081 
The judgment in favor of Langford Investment Company for $1,200 for rents was rendered on June 9, 1930, and the same was for the unpaid amount of rents due by Mrs. Laning to the Langford Investment Company at the rate of $60 per month from August 30, 1928, to April 30, 1930, a period of twenty months.
In Roco v. Green, 50 Tex. 483, it is said:
"We deduce from the authorities the following general rules to determine when the relation of a family, as contemplated by law, exists:
"1. It is one of social status, not of mere contract.
"2. Legal or moral obligation on the head to support the other members.
"3. Corresponding state of dependence on the part of the other members for this support. (Thomp. on H. and E., sees. 45, 46, and authorities cited.)"
In Wolfe v. Buckley, 52 Tex. 641, The Supreme Court affirmed the judgment of the trial court decreeing that certain property owned by Mrs. Buckley and claimed by her as a homestead was exempt from forced sale under the provisions of the Constitution protecting a homestead. And in that opinion it was held in effect that a finding that Mrs. Buckley was the head of a family was supported by "the peculiar social status of the parties; the prior assumed obligation of Mrs. Buckley to support these children, and their state of dependence upon her for moral training, and for at least a portion of their support and maintenance; her previously long-formed intention to adopt Anna, and the general policy of our laws providing exemption in favor of widows and minor children."
The tests announced in the two decisions last noted have been followed in many recent decisions, such as Seley, Guardian v. Howell, 115 Tex. 583,285 S.W. 815, 817. In that case, the Supreme Court sustained an order of the probate court setting aside to Mrs. Sally Howell, out of the estate of her son, as insane with a guardian appointed, an allowance for her support under and by virtue of the provisions of article 4275, of the Revised Civil Statutes 1925, authorizing the probate court in such a case to make "orders for the support of his family and the education of his children when necessary."
The disputed issue in that case was whether or not the mother was a constitutent of the family of the insane son, who had lived with her in her own home at the time he was adjudged insane, the mother having no other means of support except her income of $20 a month allowed to her by the United States government by reason of her dependency upon her son, and from which allowance she was compelled to pay taxes on her home. It appeared that the mother was an invalid, in delicate health, and under the constant care of a physician, and prior to his adjudication, the son had lived with her and helped to support and care for her. In that decision the following was quoted with approval from Wilson v. Cochran,31 Tex. 680, 98 Am.Dec. 553, on the meaning of word "family":
"It was most certainly used in its generic sense, embracing a household, composed of parents and children, or other relatives, or domestics and servants: in short, every collective body of persons living together within the same curtilage, subsisting in common, directing their attention to a common object, the promotion of their mutual interests and social happiness. These must have been the characteristics of the `family' contemplated by the framers of the constitution in engrafting this provision upon it. It is, besides, the most popular acceptation of the word, and is more fully in unison with the beneficent conception of the political power of the state, in making so human and so wise a concession as that of the inviolability of a homestead from all invasion by legal process."
And the opinion by the Commission of Appeals, adopted by the Supreme Court, concludes with the following:
"The right and power of the court to make the order complained of, depending as it does upon the statute being construed, and our construction being that appellee under the facts shown is a member of the family of her afflicted son, Van Buren Howell, we see no reason why the judgment should not be affirmed. Indeed, it would be a great injustice in the instant case if the statutes were so inflexible as to exclude an order, the objects of which were so beneficent. Van Buren Howell was under no legal obligation to support his aged and dependent mother, but he at all times recognized that finer and, in a sense, superior moral obligation, and was accordingly supporting her until his adjudication. The construction we have given this statute merely makes possible the continued support that the unfortunate son undoubtedly would have bestowed upon his mother but for his overwhelming misfortune. His `family,' within the meaning of the statute governing, was the group constituted through his own selection, and recognized by his free choice, as it existed at the time of his commitment."
The rule of decisions is that a temporary writ of injunction will not be granted unless the same is reasonably necessary to protect the rights of the plaintiff pending the litigation and that the allowance of such a writ rests largely in the discretion of the judge to whom application for such relief is made. But such discretion does not mean the arbitrary will of the court; it must be based upon the established principles, rules and *Page 1082 
practice of equity jurisprudence. And in 14 R. 0. L., par. 11, p. 313, it is said:
"The grace which the court may thus exercise sometimes becomes a matter of right to a litigant, and when it is clear that the law cannot give protection and relief, to which the complainant in equity is admittedly entitled, the court can no more withhold its grace than the law can deny protection and relief, if able to give them."
And in paragraph 12 on the same page the following is said:
"With the exercise of discretion by a trial court appellate courts will not ordinarily interfere, unless a right is clearly shown to exist to which recognition has not been properly accorded in the lower court, or there appears to have been a clear abuse of power. If there has been a reasonable showing made in support of the application in the court below, its action in granting an injunction will be sustained. Ordinarily, it is sufficient if a transaction is shown which makes a proper subject for investigation in a court of equity. But if the allegations of the bill are sufficient, and the evidence in support thereof is ample to warrant the granting of the temporary injunction, and no sufficient defense is made, an order denying an injunction will be reversed."
In 32 Corpus Juris, p. 36, the same doctrine is announced, but following that announcement and on page 37 occurs the following:
"Nevertheless, there are a large number of decisions which hold that it is not sufficient ground for refusing a preliminary injunction that it is not absolutely certain that the complainant has the right that he claims or that the injury feared will occur; and even though complainant's right to permanent relief is doubtful, it may be proper to maintain the status quo pending the determination of his right, the issuance of a temporary injunction in such cases depending chiefly upon the relative inconvenience to be caused the parties. The complainant it was said may be entitled to a preliminary injunction in cases where his right to the relief prayed may fail on a hearing on the merits."
And on page 39 occurs the following:
"If complainant shows that an irreparable injury will probably be suffered by him before the final hearing, that there is a reasonable probability that he will establish the facts as he alleges, and that the injunction will not cause a great injury to defendant, a preliminary injunction should issue to maintain the status quo, despite the conflict as to facts."
To the same effect, see 14 R.C.L. par. 60, p. 357.
It is to be noted that Mrs. Laning testified without contradiction that the father of the child whom she had taken into her home was unable to support her and the finding of the trial judge that he is able to support her is assailed by appellant as being contrary to the undisputed testimony of the plaintiff. We are unable to say, as insisted by the appellee, that facts testified to by the plaintiff conclusively refute her statement that the father was unable to support the child. Nor can we concur in the appellee's further contention that appellant is under no moral obligation for such support, and that the child is not, to some extent at least, dependent on the plaintiff for support and moral training. It further appears from all the facts that there is a reasonable probability that plaintiff may, upon a trial of the case on its merits, sustain her contention that the automobile levied on is exempt under the provisions of article 3832 of the statutes, and that the refusal of the temporary writ of injunction prayed for may result in her irreparable injury, in the event she establishes her claim of such exemption upon the final trial of the case on its merits. It is further apparent from all the facts that aside from the loss of interest on the value of the car, the defendant will not suffer any material loss by the granting of the temporary injunction and requiring it to await the final determination of the case on its merits. Indeed, in his order refusing the temporary writ of injunction, the court expressly provided that the car should not be sold under the execution that had been levied, until appellant's appeal from that order should be determined by this court; and appellee did not except to that limitation nor has any complaint been made of it here.
Accordingly, we have reached the conclusion that the judgment or order refusing plaintiff's application for a temporary writ of injunction should be reversed and the cause remanded for further proceedings not inconsistent with the foregoing conclusions; and it is so ordered